UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SKYLER JAMES FOWLER,

                          Plaintiff,

    v.

CHARLES DANIELS, *et al.*,

                       Defendants.

Case No. 3:22-cv-00195-MMD-CLB

SCREENING ORDER ON
FIRST AMENDED COMPLAINT

## I.    SUMMARY

Plaintiff Skyler James Fowler, who is incarcerated in the custody of the Nevada Department of Corrections ("NDOC"), has submitted a first amended civil rights complaint ("FAC") pursuant to 42 U.S.C. § 1983, and has filed an application to proceed *in forma pauperis*.[1] (ECF Nos. 8, 9.) The matter of the filing fee will be temporarily deferred. Plaintiff has also moved for the entry of a temporary restraining order or preliminary injunction. (ECF Nos. 11, 12.) The Court will address the motions for a temporary restraining order or preliminary injunction in a separate order. The Court now screens Plaintiff's FAC under 28 U.S.C. § 1915A.[2]

## II.    SCREENING STANDARD

Federal courts must conduct a preliminary screening in any case in which an incarcerated person seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). In its review, the court must identify any cognizable claims and dismiss any claims that are frivolous, malicious, fail to state a

---

[1]An amended complaint replaces an earlier complaint. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989). Therefore, the operative complaint here is the FAC. (ECF No. 8.)

[2]Plaintiff has also filed several additional motions, which the Court addresses below. (ECF Nos. 13, 14, 15.)

claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See id.* § 1915A(b)(1), (2). *Pro se* pleadings, however, must be liberally construed. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

In addition to the screening requirements under § 1915A, pursuant to the Prison Litigation Reform Act ("PLRA"), a federal court must dismiss an incarcerated person's claim if "the allegation of poverty is untrue" or if the action "is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Dismissal of a complaint for failure to state a claim upon which relief can be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and the court applies the same standard under § 1915 when reviewing the adequacy of a complaint or an amended complaint. When a court dismisses a complaint under § 1915(e), the plaintiff should be given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear from the face of the complaint that the deficiencies could not be cured by amendment. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995).

Review under Rule 12(b)(6) is essentially a ruling on a question of law. *See Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 723 (9th Cir. 2000). Dismissal for failure to state a claim is proper only if it is clear that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In making this determination, the court takes as true all allegations of material fact stated in the complaint, and the court construes them in the light most favorable to the plaintiff. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a *pro se* complainant are held to less stringent standards than formal pleadings drafted by lawyers. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). While

1  the standard under Rule 12(b)(6) does not require detailed factual allegations, a plaintiff
2  must provide more than mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550
3  U.S. 544, 555 (2007). A formulaic recitation of the elements of a cause of action is
4  insufficient. *Id*.

5      Additionally, a reviewing court should "begin by identifying pleadings [allegations]
6  that, because they are no more than mere conclusions, are not entitled to the assumption
7  of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "While legal conclusions can provide
8  the framework of a complaint, they must be supported with factual allegations." *Id.* "When
9  there are well-pleaded factual allegations, a court should assume their veracity and then
10  determine whether they plausibly give rise to an entitlement to relief." *Id.* "Determining
11  whether a complaint states a plausible claim for relief . . . [is] a context-specific task that
12  requires the reviewing court to draw on its judicial experience and common sense." *Id*.

13      Finally, all or part of a complaint filed by an incarcerated person may be dismissed
14  *sua sponte* if that person's claims lack an arguable basis either in law or in fact. This
15  includes claims based on legal conclusions that are untenable (e.g., claims against
16  defendants who are immune from suit or claims of infringement of a legal interest which
17  clearly does not exist), as well as claims based on fanciful factual allegations (e.g.,
18  fantastic or delusional scenarios). *See Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989);
19  *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

20  **III.    SCREENING OF FAC**

21      In the FAC, Plaintiff sues multiple Defendants for events that took place while he
22  was incarcerated at Lovelock Correctional Center ("LCC"). (ECF No. 8 at 1-3.) Plaintiff
23  sues Defendants Director Charles Daniels, Dr. Dana Ralph Marks, Medical Director
24  Michael Minev, Associate Warden Kara LeGrand, and Caseworker Roger Terance. (*Id.*)
25  Plaintiff brings four claims and seeks monetary, injunctive, and declaratory relief. (*Id.* at
26  4-21.)

27

28

### A.    Claims 1 and 2

In Claims 1 and 2, Plaintiff alleges the following. Plaintiff began having seizures in early 2019, when the NDOC "abrupt[ly]" discontinued his "psychiatric medications," causing him to "fall and smack his head on the concrete floor of his cell." (*Id.* at 4.) Plaintiff ultimately filed suit about the inadequate treatment he was receiving for his seizures. (*Id.*) The court ordered the NDOC to send Plaintiff to a neurologist. (*Id.*) The neurologist prescribed Vimpat and gabapentin to treat Plaintiff's seizures and neuropathy. (*Id.*)

Before Plaintiff was prescribed these medications, he had been having an average of five seizures a month. (*Id.* at 5.) Plaintiff began receiving the medications in early July 2021. (*Id.*) They proved so effective that Plaintiff now describes them as "miraculous." (*Id.*) Plaintiff had only one seizure during the four weeks he was on the medication regimen, and that seizure took place "on a day when Plaintiff was being transported between prisons and received neither medication." (*Id.*) The medications not only had "100% efficacy in treating Plaintiff's seizures," they also reduced his "neuropathic pain by about 90%" and treated his "OCD, depression, and anxiety far more effectively" than any other medications he had taken. (*Id.*)

On or about July 28, 2021, Dr. Marks, a physician at LCC, "abruptly and without any precipitating event discontinued Plaintiff's gabapentin." (*Id.*) Dr. Marks had never met or spoken with Plaintiff, who received "no warning" that his medication would be discontinued. (*Id.*)

On August 1, 2021, Plaintiff had a seizure. (*Id.*) He fell, hit his head on concrete, lost consciousness, and was "rushed by ambulance to the local hospital's emergency room." (*Id.*) At the hospital, Dr. Endo prescribed gabapentin, giving Plaintiff "one dose immediately" and sending a ten-day supply "back with the transporting officers." (*Id.* at 5-6.) Dr. Endo also noted that Plaintiff had experienced a "[g]eneralized seizure" and had a "[h]istory of poorly controlled and idiopathic etiology epilepsy." (*Id.* at 5.)

During the hospital visit and upon his return to LCC, Plaintiff "angrily ranted to numerous guards and nurses" that (i) "he believed Dr. Marks to be a 'quack' and a

4

psychopath," and (ii) he "intended to 'sue his ass off.'" (*Id.* at 6.) The following morning, on August 2, 2021, Dr. Marks ordered LCC's nurses "not to comply with Dr. Endo's gabapentin prescription." (*Id.*) Dr. Marks also "abruptly discontinued" two other prescriptions. (*Id.*) Plaintiff filed an emergency grievance about the issue; the grievance was "intercepted and denied." (*Id.*)

The next day, on August 3, 2021, Plaintiff had another seizure. (*Id.*) He fell, reopening the head wound from the previous seizure; he also "bled all over the floor" and urinated on himself. (*Id.*) Dr. Marks "ordered that Plaintiff not be taken to a hospital," and he continued to withhold Plaintiff's medications. (*Id.*) Three weeks later, Plaintiff sent medical kites to Dr. Marks and Minev recounting these incidents and "requesting restoration of his medications." (*Id.*) Plaintiff never received a response. (*Id.*) Plaintiff then filed multiple grievances about these issues from September 2021 to December 2021. (*Id.* at 7.) LeGrand "erroneously denied" the first grievance on "procedural grounds"; the remaining grievances—including a second-level grievance directed to Daniels—went unanswered. (*Id.* at 7, 10.) Plaintiff also did not receive responses to medical kites he submitted in October and November 2021. (*Id.* at 7-8.)

On November 10, 2021, Dr. Nottin referred Plaintiff to a neurologist. (*Id.* at 7.) Plaintiff has not, however, seen a neurologist since June 2021. (*Id.*) On November 18, 2021, Dr. Caldwell-Barr, a psychologist, saw Plaintiff for a "routine mental health check-up." (*Id.*) After explaining the "events surrounding" the discontinuation of his seizure medications, Plaintiff asked Dr. Caldwell-Barr to email "Nurse Sarah" to set up an appointment with Dr. Carroll, the NDOC's psychiatrist. (*Id.*) Dr. Caldwell-Barr sent the email. (*Id.*) Plaintiff had similar conversations with Dr. Caldwell-Barr in December 2021 and January 2022. (*Id.* at 8-9.)

On December 6, 2021, Plaintiff saw Dr. Kaiser, an orthopedic surgeon, for a consultation about his "hand injuries." (*Id.* at 8.) Dr. Kaiser recommended gabapentin to treat the nerve pain in Plaintiff's hand. (*Id.*) But Dr. Kaiser declined to prescribe it,

1    explaining that he did not "want to be responsible for managing a prescription that may

2    be necessary for years." (*Id.*) Dr. Kaiser told Plaintiff to follow up with Dr. Marks. (*Id.*)

3        On January 18, 2022, Plaintiff finally saw Dr. Carroll. (*Id.* at 9.) Plaintiff recited "the

4    history of his seizures, medication discontinuation, and ongoing symptoms." (*Id.*) Dr.

5    Carroll said she was "not authorized" to prescribe anti-epileptic drugs or refer Plaintiff to

6    a neurologist. (*Id.*)

7        One month later, Plaintiff and the defendants in a prior lawsuit reached a

8    settlement. (*Id.*) The settlement agreement provided that Plaintiff would "be allowed to

9    consult with a NDOC doctor, other than Dr. Dana Marks, to determine if it would be

10   necessary to be prescribed ear plugs, antiseizure medication, and/or a lower bunk." (*Id.*)

11       From March 2022 to May 2022, Plaintiff filed several medical kites "requesting

12   treatment for his seizures." (*Id.*) Plaintiff did not receive a response. Meanwhile, on May

13   5, 2022, Plaintiff was transferred from LCC to Northern Nevada Correctional Center. (*Id.*)

14   Plaintiff continues to have seizures, and he has "not received any treatment since his

15   medications were discontinued." (*Id.* at 10.)

16       Based on these allegations, Plaintiff brings an Eighth Amendment claim for

17   deliberate indifference to serious medical needs (Claim 1), and a First Amendment

18   retaliation claim (Claim 2). (*Id.* at 4, 12.)

19                  **1.    Deliberate Indifference to Serious Medical Needs**

20       The Eighth Amendment prohibits the imposition of cruel and unusual punishment

21   and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity,

22   and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). A prison official violates the

23   Eighth Amendment when he acts with "deliberate indifference" to the serious medical

24   needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "To establish an Eighth

25   Amendment violation, a plaintiff must satisfy both an objective standard—that the

26   deprivation was serious enough to constitute cruel and unusual punishment—and a

27   subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th

28   Cir. 2012).

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted). To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id*. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id*. (internal quotations omitted). When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference").

Plaintiff states a colorable claim against Dr. Marks for deliberate indifference to serious medical needs. Plaintiff identifies serious medical needs stemming from the seizures he began experiencing in early 2019. (ECF No. 8 at 4.) To treat Plaintiff's seizures, a neurologist prescribed Vimpat and gabapentin. (*Id*.) The medications proved highly effective at treating not only Plaintiff's seizures, but also his nerve pain and mental health issues. (*Id*. at 5.) Yet, four weeks after Plaintiff began this medication regimen, Dr. Marks "abruptly and without any precipitating event discontinued Plaintiff's gabapentin." (*Id*.) Dr. Marks made this decision without even meeting or speaking to Plaintiff. (*Id*.) Following the discontinuation of his medication, Plaintiff resumed having seizures, and he continues to experience them as of the filing of the Complaint. (*Id*. at 5-6, 10.) Taken together, these allegations are sufficient to plead that Dr. Marks acted with deliberate indifference to Plaintiff's medical needs by denying him his prescribed medication. *See Roberts v. McDonald*, Case No. 11-cv-0474, 2013 WL 3283351, at *8 (E.D. Cal. June 27, 2013) (holding that the plaintiff stated an Eighth Amendment claim based on allegations that the defendant "denied him his prescribed medication"), *adopted by* 2013 WL 4094389

1 (E.D. Cal. Aug. 13, 2013). Thus, the Eighth Amendment claim will proceed against Dr.
2 Marks.

3      Plaintiff also states a colorable claim against LeGrand, Minev, and Daniels. "[A]
4 supervisor who learns about an unconstitutional denial of adequate medical care from a
5 prisoner's grievance and fails to intervene may be found to have personally participated
6 in the Eighth Amendment violation." *Nicholson v. Finander*, Case No. 12-cv-9993, 2014
7 WL 1407828, at *8 (C.D. Cal. Apr. 11, 2014); *see also Sharpe v. Cryer*, Case No. 19-cv-
8 00711, 2021 WL 3911306, at *15 (E.D. Cal. Sept. 1, 2021) (noting that "many district
9 courts . . . have extended liability to reviewers of healthcare appeals who learn of an
10 unconstitutional condition that can be remedied and yet take no action"), *adopted by* 2021
11 WL 5177451 (E.D. Cal. Nov. 8, 2021). Here, Plaintiff alleges that he submitted numerous
12 kites and grievances to LeGrand, Minev, and Daniels about the denial of his anti-seizure
13 medication. (ECF No. 8 at 6-7, 10.) Despite learning that Plaintiff was experiencing
14 seizures due to the discontinuation of his medication, these Defendants allegedly failed
15 to take any action to remedy the situation. (*Id.*) Because Plaintiff adequately alleges that
16 LeGrand, Minev, and Daniels were deliberately indifferent to his medical needs, the
17 Eighth Amendment claim will proceed against them.

18      **2.   First Amendment Retaliation**

19      Prisoners have a First Amendment right to file prison grievances and to pursue
20 civil rights litigation in the courts. *See Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir.
21 2004). "Without those bedrock constitutional guarantees, inmates would be left with no
22 viable mechanism to remedy prison injustices. And because purely retaliatory actions
23 taken against a prisoner for having exercised those rights necessarily undermine those
24 protections, such actions violate the Constitution quite apart from any underlying
25 misconduct they are designed to shield." *Id*.

26      To state a viable First Amendment retaliation claim in the prison context, a plaintiff
27 must allege "(1) [a]n assertion that a state actor took some adverse action against an
28 inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)

chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id*. at 567-68. For First Amendment retaliation purposes, "protected conduct" does not need to be "tethered to the speech or associational freedoms secured by that Bill of Rights provision." *Blaisdell v. Frappiea*, 729 F.3d 1237, 1242 (9th Cir. 2013). Instead, "a claim for retaliation can be based upon the theory that the government imposed a burden on the plaintiff, more generally, because he exercise[d] a constitutional right." *Id.* (internal quotation marks omitted). In addition, total chilling is not required to state a retaliation claim; it is enough if an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities. *See Rhodes*, 408 F.3d at 568-69.

Plaintiff states a colorable retaliation claim against Dr. Marks. Plaintiff alleges that he engaged in protected activity on August 1, 2021, by telling "numerous guards and nurses" that he "intended to 'sue [Dr. Marks's] ass off.'" (ECF No. 8 at 6.) *See Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) ("[T]hreats to sue fall within the purview of the constitutionally protected right to file grievances."). The morning after Plaintiff made this threat, Dr. Marks allegedly (i) ordered LCC's nurses "not to comply with Dr. Endo's gabapentin prescription," and (ii) "abruptly discontinued" two other prescriptions. (*Id*.) These allegations set forth "a chronology of events from which retaliation can be inferred." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *see also Jones v. Baldinado*, Case No. 20-cv-01371, 2020 WL 5545399, at *5, *9 (D. Ariz. Sept. 16, 2020) (holding that the plaintiff stated a First Amendment retaliation claim based on the allegation that, "after he filed an informal complaint against Defendant Leifson, Defendant Leifson retaliated against him by discontinuing both [of his] medications"). Thus, the First Amendment retaliation claim will proceed against Dr. Marks.

**B.    Claims 3 and 4**

In Claims 3 and 4, Plaintiff alleges the following. Since 2018, Plaintiff has been an adherent of Thelema, an "Earth-based religion" that requires outdoor worship. (ECF No.

8 at 13, 19.) Plaintiff began seeking a religious dietary accommodation in August 2018, and he started receiving the "common fare" diet in April 2019. (*Id.* at 13.)

Although LCC maintains a policy prohibiting inmates from taking food out of the chow hall, "unwritten exceptions" exist. (*Id.*) For example, when "insufficient staffing" requires it, inmates receive Styrofoam containers in the chow hall to "take their breakfast and/or dinner meals back to their cells." (*Id.*) Inmates also receive a "sack lunch" with their breakfast "in lieu of serving a meal at lunchtime," and they are required to "take [the sack lunch] back to their cells." (*Id.*)

LCC maintains a policy of giving inmates 20 minutes to eat in the chow hall. (*Id.* at 14.) In practice, however, inmates usually have only 10 to 15 minutes to eat. (*Id.*) Moreover, LCC has an "unwritten policy" under which officers "begin rushing the remaining inmates out" of the chow hall once "about half of a given unit's inmates have left." (*Id.*)

These time constraints are "even worse" for inmates who reside in LCC's "Structured Living Program." (*Id.*) Such inmates must finish eating by the time their "Battalion Leader" is done. (*Id.*) As a result, they typically have only eight to 12 minutes to eat each meal. (*Id.*) Plaintiff was part of the Structured Living Program from July 2021 to February 2022. (*Id.*) Terance was in charge of the program until approximately December 2021; LeGrand oversaw both the program and LCC's chow hall. (*Id.* at 15.) Both were aware of the official and unofficial policies described above. (*Id.*)

Inmates such as Plaintiff who participate in the common fare diet do not receive "hot prepared meals." (*Id.*) Instead, they are given the "raw ingredients" required to make meals. (*Id.*) For example, they might receive "whole tomatoes and zucchini, half of an onion or bell pepper, quinoa, hummus, etc." (*Id.*) Given the time constraints on eating in the chow hall, inmates on the common fare diet "cannot both prepare and eat" their meals "within the allotted time." (*Id.*) For example, Plaintiff alleges that "no one can reasonably be expected to eat . . . half of a raw white onion as if it were an apple." (*Id.*) The problem

is made worse by the fact that "the only items permitted in the [chow] hall are a plastic cup and a plastic 'safety spork.'" (*Id.*)

On July 18, 2021, Plaintiff filed an informal grievance about this issue, citing "interfere[nce] with his religious rights" and requesting that "he either be given more time to eat or be allowed to take his common fare food back to his cell." (*Id.*) About a week later, Plaintiff sent a kite to LeGrand, describing an incident in which "several C/Os intimidated him into leaving the dining hall early." (*Id.* at 16.) Although Plaintiff "asked for her help," LeGrand "never responded." (*Id.*) Instead, on August 4, 2021, LeGrand sent Plaintiff a "warning," threatening to remove him from the common fare diet "over his purchase of a Hot Pocket." (*Id.*)

On August 24, 2021, Plaintiff filed a medical kite, "explain[ing] the reasons he needed more time to eat." (*Id.*) He received a response from "dental" stating that "they could not authorize such [an accommodation] and he would need to address the issue with 'custody.'" (*Id.*)

On August 25, 2021, Terance denied Plaintiff's informal grievance but did not "address[ ] the problems." (*Id.* at 17.) Instead, Terance cited LCC operational procedures and "complain[ed] about the irrelevant fact that Plaintiff didn't name any individual officers who were enforcing the 8-12 minute policy." (*Id.*) On September 1, 2021, Plaintiff filed a first-level grievance, which was denied in a response that reiterated Terance's reasons for denying the informal grievance. (*Id.*) Then, on October 19, 2021, Plaintiff filed a second-level grievance, listing six officers who could "verify the existence of the policy," explaining that "even 20 minutes was inadequate for common fare," and stating that he had been forced to "violate his religious dietary restrictions and discontinue his common fare status as a result of [LCC's] policies." (*Id.* at 17-18.)

In short, Plaintiff was forced to choose between (i) "remaining on the common fare and not being able to eat enough food," and (ii) "discontinuing [the] common fare in order to avoid hunger and malnutrition." (*Id.* at 18.) Plaintiff chose the latter course. (*Id.*) As a

1  result, he has been "unable to properly exercise his religious beliefs" since August 2021.

2  (*Id.*)

3          Separately, Plaintiff alleges that from July 2021 to April 2022, Daniels instituted

4  and enforced a policy "banning all religious services in NDOC prisons." (*Id.* at 19.) This

5  decision was "ostensibly, but not actually," based on COVID-19. (*Id.*) During this time,

6  "numerous other types of large gatherings were permitted," including workshops run by

7  Prison Industries. (*Id.*) Daniels was aware of—yet declined to adopt—"less restrictive

8  alternatives to mitigate the spread of COVID-19" than the "blanket closure of religious

9  services." (*Id.*) This burdened Plaintiff's religious practice, which "requir[ed] outdoor

10 worship." (*Id.*)

11         Based on these allegations, Plaintiff asserts a First Amendment free exercise claim

12 related to his inability to participate in the common fare diet (Claim 3), and a free exercise

13 claim related to the cancellation of all religious services between July 2021 and April 2022

14 (Claim 4). (*Id.* at 13, 19.)

15                   **1.    Free Exercise**

16         The First Amendment to the United States Constitution provides that Congress

17 shall make no law respecting the establishment of religion or prohibiting the free exercise

18 thereof. U.S. Const. Amend. I. The Supreme Court has held that inmates retain the

19 protections afforded by the First Amendment, "including its directive that no law shall

20 prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

21 (1987). The Supreme Court also has recognized that an inmate's "limitations on the

22 exercise of constitutional rights arise both from the fact of incarceration and from valid

23 penological objectives—including deterrence of crime, rehabilitation of prisoners, and

24 institutional security." *Id.* "A person asserting a free exercise claim must show that the

25 government action in question substantially burdens the person's practice of his religion.

26 A substantial burden . . . place[s] more than an inconvenience on religious exercise; it

27 must have a tendency to coerce the individuals into acting contrary to their religious

28 beliefs or exert substantial pressure on an adherent to modify his behavior and to violate

1   his beliefs." *Jones v. Williams*, 791 F.3d 1023, 1031-32 (9th Cir. 2015) (internal quotations

2   and citations omitted). Even if such a belief is substantially burdened, the challenged

3   prison regulation is "valid if it is reasonably related to legitimate penological

4   interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

5        Plaintiff states a colorable free exercise claim against Terance and LeGrand.

6   Plaintiff alleges that to accommodate his religious beliefs as a practitioner of Thelema,

7   the NDOC allowed him to begin receiving the common fare diet in April 2019. (ECF No.

8   8 at 13.) Since August 2021, however, Plaintiff has been unable to participate in the

9   common fare diet. (*Id.* at 18.) Plaintiff attributes this to LCC policies and practices that (i)

10  give inmates a maximum of 10 to 15 minutes to eat in the chow hall, and (ii) forbid inmates

11  from taking meals back to their cells. (*Id.* at 14.) As a result, inmates on the common fare

12  diet—which consists of the "raw ingredients" for meals—cannot "both prepare and eat"

13  their meals "within the allotted time." (*Id.* at 15.) Thus, if Plaintiff remained on the common

14  fare diet, he would not be getting enough food. (*Id.* at 18.) But if he ended his participation

15  in the common fare diet, he would be violating his religious beliefs. (*Id.*) Plaintiff ultimately

16  gave up the common fare diet. (*Id.*) Taken together, these allegations are sufficient to

17  plead that the challenged policies and practices "coerce[d] [Plaintiff] into acting contrary

18  to [his] religious beliefs." *Jones*, 791 F.3d at 1031-32. Accordingly, the free exercise claim

19  will proceed against Terance and LeGrand—both of whom are alleged to have played a

20  role in maintaining the policies and practices that caused Plaintiff to violate his religious

21  beliefs. (ECF No. 8 at 15.)

22       Plaintiff also states a colorable free exercise claim against Daniels. Plaintiff alleges

23  that from July 2021 to April 2022, Daniels instituted and enforced a policy "banning all

24  religious services in NDOC prisons." (*Id.* at 19.) Although the policy purported to be

25  motivated by COVID-19-related concerns, Daniels permitted "numerous other types of

26  large gatherings," including workshops run by Prison Industries. (*Id.*) The policy allegedly

27  burdened Plaintiff's religious practice, which "requir[ed] outdoor worship." (*Id.*) Liberally

28  construe, these allegations are sufficient to plead that Daniels implemented a policy that

substantially burdened Plaintiff's religious exercise. The question of whether the policy "is reasonably related to legitimate penological interests" may be addressed at a later stage of the litigation. *Turner*, 482 U.S. at 89; *see also Brittain v. Sheriff of Riverside Cnty.*, Case No. 05-cv-1075, 2006 WL 8427288, at *7 (C.D. Cal. July 26, 2006) ("A determination of the reasonableness of defendants' restriction of plaintiff's exercise of his religion is a fact-intensive inquiry that cannot be conducted at [the pleading stage]."). Thus, the free exercise claim will proceed against Daniels.

## IV.   PLAINTIFF'S MOTIONS

### A.   ECF No. 13

Plaintiff has filed a "motion to correct the docket," citing several alleged errors in the docketing of his filings in this action. (ECF No. 13.) The Court denies the motion. Plaintiff first contends that the Court mistakenly docketed his FAC as a "Proposed Amended Complaint" "under the event type 'Notice (Other).'" (*Id.* at 2.) He requests that the Court change the event type to "Amended Complaint." (*Id.*) Plaintiff's request is moot. As part of this screening order, the Court will direct the Clerk of Court to docket the FAC. The FAC will then be listed as the First Amended Complaint on the docket.

Plaintiff next contends that the Court erroneously "inserted quotation marks around the word 'emergency' in the titles" of his motions for a temporary restraining order or preliminary injunction. (*Id.*) There is no need to change the docket text for these motions. The placement of quotation marks around the word "emergency" will have no bearing on the Court's consideration of Plaintiff's requests for injunctive relief. The Court will consider those requests—and their alleged emergency nature—on the merits.

Plaintiff also states that the Court should not have filed the exhibits to the FAC as a separate docket entry. (*Id.*) He claims that the exhibits should have been filed as attachments to his FAC. (*Id.*) The filing of Plaintiff's exhibits as a separate docket entry has no effect on the Court's consideration of those exhibits. Thus, the Court declines to re-docket Plaintiff's exhibits.

**B.    ECF No. 14**

Plaintiff has filed a motion to exceed by one page the 24-page limit for motions for a temporary restraining order or preliminary injunction. (ECF No. 14.) Plaintiff notes that his motions "would have contained only" 23 pages had he "not included tables of contents and authorities." (*Id.*) The Court grants Plaintiff's motion and will consider his motions for a temporary restraining order or preliminary injunction on the merits.

**C.    ECF No. 15**

Finally, Plaintiff has filed a "motion for ECF registration," asking the Court to register his email address with the CM/ECF system so that he can "receiv[e] notices of electronic filing." (ECF No. 15.) Plaintiff explains that, although he receives paper copies of filings in this case, such copies "can be lost, stolen, or damaged," whereas "electronic copies are effectively eternal." (*Id.* at 2.)

The Court denies Plaintiff's motion. Plaintiff does not contend that he has failed to receive (or lost) any filings related to this case. Nor does he allege that his receipt of paper copies has impeded his ability to effectively litigate this action. Moreover, Plaintiff acknowledges that because he is incarcerated, he "cannot directly access his email account," and would only be able to access it "by proxy via friends and family." (*Id.*) Thus, the Court declines to register Plaintiff's email address with the CM/ECF system.

**V.    CONCLUSION**

It is therefore ordered that a decision on the application to proceed *in forma pauperis* (ECF No. 9) is deferred.

The Clerk of Court is directed to file the FAC (ECF No. 8), which is the operative complaint, and send Plaintiff a courtesy copy.

It is further ordered that Claim 1, alleging deliberate indifference to serious medical needs in violation of the Eighth Amendment, will proceed against Defendants Dr. Marks, LeGrand, Minev, and Daniels.

It is further ordered that Claim 2, alleging First Amendment retaliation, will proceed against Defendant Dr. Marks.

1       It is further ordered that Claim 3, alleging violations of the First Amendment right

2  to free exercise based on Plaintiff's inability to participate in the common fare diet, will

3  proceed against Defendants Terance and LeGrand.

4       It is further ordered that Claim 4, alleging violations of the First Amendment right

5  to free exercise based on the cancellation of all religious services between July 2021 and

6  April 2022, will proceed against Defendant Daniels.

7       It is further ordered that Plaintiff's motion to correct the docket (ECF No. 13) is

8  denied.

9       It is further ordered that Plaintiff's motion for leave to file excess pages (ECF No.

10  14) is granted.

11       It is further ordered that Plaintiff's motion for ECF registration (ECF No. 15) is

12  denied.

13       It is further ordered that the Court will address Plaintiff's motions for a temporary

14  restraining order or preliminary injunction (ECF Nos. 11, 12) in a separate order.

15       It is further ordered that, given the nature of the claims that the Court has permitted

16  to proceed, this action is stayed for 90 days to allow Plaintiff and Defendants an

17  opportunity to settle their dispute before the $350.00 filing fee is paid, an answer is filed,

18  or the discovery process begins. During this 90-day stay period and until the Court lifts

19  the stay, no other pleadings or papers may be filed in this case, and the parties may not

20  engage in any discovery, nor are the parties required to respond to any paper filed in

21  violation of the stay unless specifically ordered by the court to do so. The Court will refer

22  this case to the Court's Inmate Early Mediation Program, and the Court will enter a

23  subsequent order. Regardless, on or before 90 days from the date this order is entered,

24  the Office of the Attorney General must file the report form attached to this order regarding

25  the results of the 90-day stay, even if a stipulation for dismissal is entered prior to the end

26  of the 90-day stay. If the parties proceed with this action, the Court will then issue an

27  order setting a date for Defendants to file an answer or other response. Following the

28

1   filing of an answer, the Court will issue a scheduling order setting discovery and
2   dispositive motion deadlines.

3       It is further ordered that "settlement" may or may not include payment of money
4   damages. It also may or may not include an agreement to resolve Plaintiff's issues
5   differently. A compromise agreement is one in which neither party is completely satisfied
6   with the result, but both have given something up and both have obtained something in
7   return.

8       It is further ordered that if the case does not settle, Plaintiff will be required to pay
9   the full $350.00 statutory filing fee for a civil action. This fee cannot be waived, and the
10  fee cannot be refunded once the Court enters an order granting Plaintiff's application to
11  proceed *in forma pauperis*. If Plaintiff is allowed to proceed *in forma pauperis*, the fee will
12  be paid in installments from his prison trust account. *See* 28 U.S.C. § 1915(b). If Plaintiff
13  is not allowed to proceed *in forma pauperis*, the full $350 statutory filing fee for a civil
14  action plus the $52 administrative filing fee, for a total of $402, will be due immediately.

15      It is further ordered that if any party seeks to have this case excluded from the
16  inmate mediation program, that party must file a "motion to exclude case from mediation"
17  no later than 21 days prior to the date set for mediation. The responding party will have
18  seven days to file a response. No reply may be filed. Thereafter, the Court will issue an
19  order, set the matter for hearing, or both.

20      It is further ordered that if Plaintiff needs an interpreter to participate in the
21  mediation program, Plaintiff will file a notice identifying the interpretation language and
22  the need for the interpreter within 30 days from the date of this order.

23      The Clerk of Court is further directed to add the Nevada Department of Corrections
24  to the docket as an Interested Party and electronically serve a copy of this order and a
25  copy of Plaintiff's FAC (ECF No. 8) on the Office of the Attorney General of the State of
26  Nevada by adding the Attorney General of the State of Nevada to the interested party on
27  the docket. This does not indicate acceptance of service.

28

It is further ordered that the Attorney General's Office must advise the Court within 21 days of the date of the entry of this order whether it will enter a limited notice of appearance on behalf of Interested Party for the purpose of participation in the Early Mediation Program. No defenses or objections, including lack of service, will be waived because of the filing of the limited notice of appearance.

DATED THIS 15th Day of July 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

1
2
3
4
5

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| SKYLER JAMES FOWLER, | Case No. 3:22-cv-00195-MMD-CLB |
| Plaintiff. | REPORT OF ATTORNEY GENERAL RE: RESULTS OF 90-DAY STAY |
| v. | |
| CHARLES DANIELS, *et al.*, | |
| Defendants. | |

**NOTE: ONLY THE OFFICE OF THE ATTORNEY GENERAL WILL FILE THIS FORM. THE INMATE PLAINTIFF MAY NOT FILE THIS FORM.**

On _____ [*the date of the issuance of the screening order*], the Court issued its screening order stating that it had conducted its screening pursuant to 28 U.S.C. § 1915A, and that certain specified claims in this case would proceed. The Court ordered the Office of the Attorney General of the State of Nevada to file a report 90 days after the date of the entry of the Court's screening order to indicate the status of the case at the end of the 90-day stay. By filing this form, the Office of the Attorney General hereby complies.

**REPORT FORM**

[Identify which of the following two situations (identified in bold type) describes the case, and follow the instructions corresponding to the proper statement.]

**Situation One: Mediated Case**: **The case was assigned to mediation by a court-appointed mediator during the 90-day stay.** [If this statement is accurate, check **ONE** of the six statements below and fill in any additional information as required, then proceed to the signature block.]

_____ A mediation session with a court-appointed mediator was held on _____ [*enter date*], and as of this date, the parties have reached a settlement (*even if paperwork to memorialize the settlement remains to be completed*). (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in the case until a specified date upon which they will file a stipulation of dismissal.*)

1
2
3

_____   A mediation session with a court-appointed mediator was held on _____ [*enter date*], and as of this date, the parties have not reached a settlement.  The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

4
5
6

_____   No mediation session with a court-appointed mediator was held during the 90-day stay, but the parties have nevertheless settled the case.  (*If this box is checked, the parties are on notice that they must SEPARATELY file a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

7
8

_____   No mediation session with a court-appointed mediator was held during the 90-day stay, but one is currently scheduled for _____ [*enter date*].

9
10

_____   No mediation session with a court-appointed mediator was held during the 90-day stay, and as of this date, no date certain has been scheduled for such a session.

11
12

_____   None of the above five statements describes the status of this case.  Contemporaneously with the filing of this report, the Office of the Attorney General of the State of Nevada is filing a separate document detailing the status of this case.

13

\* \* \* \* \*

14
15
16

**Situation Two: Informal Settlement Discussions Case**: **The case was NOT assigned to mediation with a court-appointed mediator during the 90-day stay; rather, the parties were encouraged to engage in informal settlement negotiations.** [If this statement is accurate, check **ONE** of the four statements below and fill in any additional information as required, then proceed to the signature block.]

17
18
19

_____   The parties engaged in settlement discussions and as of this date, the parties have reached a settlement (*even if the paperwork to memorialize the settlement remains to be completed*).  (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

20
21

_____   The parties engaged in settlement discussions and as of this date, the parties have not reached a settlement. The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

22
23

_____   The parties have not engaged in settlement discussions and as of this date, the parties have not reached a settlement. The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

24
25
26

_____   None of the above three statements fully describes the status of this case. Contemporaneously with the filing of this report, the Office of the Attorney General of the State of Nevada is filing a separate document detailing the status of this case.

27   Submitted this _____ day of _____, _____ by:

28   Attorney Name: _____          _____
                                            Print                                             Signature

1   Address: _____     Phone:
2          _____     _____
3          Email: _____