**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| SKYLER JAMES FOWLER, | Case No. 3:22-cv-00195-MMD-CLB |
| Plaintiff, | **REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE[1]** |
| v. | [ECF Nos. 73, 86] |
| CHARLES DANIELS, *et al.*, | |
| Defendants. | |

This case involves a civil rights action filed by Plaintiff Skyler James Fowler ("Fowler") against Defendants Charles Daniels ("Daniels"), Dr. Dana Marks ("Marks"), Michael Minev ("Minev"), the Nevada Department of Corrections ("NDOC"), Jane Doe, Kara LeGrand ("LeGrand"), and Roger Terance ("Terance") (collectively referred to as "Defendants"). Before the Court are two motions: (1) Defendants' motion to dismiss the Second Amended Complaint ("SAC"), (ECF No. 73), and (2) Fowler's motion to amend to file a third amended complaint ("TAC"). (ECF No. 86.) For the reasons discussed below, the Court recommends that Defendants' motion to dismiss, (ECF No. 73), be granted in part and denied in part, and Fowler's motion to amend, (ECF No. 86), be denied.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Fowler is an inmate in the custody of the NDOC, who is currently housed at the Northern Nevada Correctional Center ("NNCC"). (ECF No. 5.) Fowler is no stranger to litigation with the NDOC, having filed prior cases related to the same claims at issue in this case. To address the pending motions, the Court must first discuss a prior lawsuit filed by Fowler, which will be referred to as the "Las Vegas case." *Fowler v. Sisolak*, *et.al*, (*Las Vegas*) No. 2:19-cv-01418-APG-DJA (D. Nev. filed Aug. 15, 2019). The Court will then turn to the factual background and procedural history of the instant case, which will

---

[1]    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

be referred to as the "Reno case."

### A.    Factual Background of the Las Vegas Case[2]

On August 15, 2019, Fowler filed his initial complaint in the Las Vegas case. (ECF No. 1.) Fowler sought leave to amend his complaint on several occasions. (*See* ECF Nos. 10; 18; 24-1, 24-2, 24-3.) Fowler's requests were granted, and the Third Amended Complaint became the final and operative pleading in the Las Vegas case. (ECF No. 62.) The Third Amended Complaint contained seventeen claims. (ECF No. 62.) Of those claims, only four are relevant here. These claims are divided into two categories — medical claims and religious claims. Each category will be addressed in turn.

#### 1.    Medical Claims

The first relevant medical claim in the Las Vegas case is for an alleged a failure to provide Fowler with psychiatric medication on numerous occasions while Fowler was incarcerated at High Desert State Prison ("HDSP"). (ECF No. 62 at 18-28.) In this claim, Fowler alleged Defendants Minev, Robin Hager ("Hager"), John Does 1-14, Dr. Romeo Aranas ("Aranas"), James Dzurenda ("Dzurenda"), Daniels, and Jane Does 1-3 periodically deprived him of his medications starting when he arrived at HDSP, until February 5, 2020, when he was allowed one month's supply of medication to keep on his person ("KOP"). (*Id.* at 18-19.) Before he was allowed KOP his medication, Fowler alleged he was deprived of his medication for a 23-day period, after the sole NDOC psychiatrist was terminated in December 2018. (*Id.* at 21.) In response to Fowler's second level grievance relating to this issue, Minev acknowledged that a "break down in the system occurred" and he was "sincerely sorry that this occurred and should be avoided in the future" but that administrative compensation was not appropriate and therefore the grievance was denied. (ECF No. 62-1 at 3.) Fowler alleged Minev and Hager were responsible for hiring and retaining medical and mental health staff and for years

---

[2]    Unless otherwise noted, citations in this section refer to the CM/ECF filings in *Fowler v. Sisolak*, *et.al*, (*Las Vegas*) No. 2:19-cv-01418-APG-DJA.

employed only a single psychiatrist for the entire NDOC population. (ECF No. 62 at 21.) Fowler also alleged Minev prevented the NDOC doctors from allowing Fowler to KOP his medication until February 5, 2020. (*Id.* at 27.)

In the second relevant medical claim, Fowler sued Defendants Minev, Dr. Rob Faulkner ("Faulkner"), A. Buen ("Buen"), Robin Hager ("Hager"), Daniels, Monique Hubbard-Pickett ("Hubbard-Pickett"), Dzurenda, and John Does 1-3 & 15 based on allegations that due to withdrawal effects from the 23-day period without his medication, he suffered multiple falls. (*Id.* at 19-27, 29-31.) Fowler alleged, "after one particularly bad fainting incident when Fowler smacked his head on the concrete floor, he began experiencing additional neurological symptoms" including seizures. (*Id.* at 30.) Fowler further alleged he began alerting Buen, Faulkner, Minev, Hubbard-Pickett, Dr. Depry, and John Doe 15 to these symptoms in January of 2019. (*Id.*) Fowler alleged that, other than a prescription of Tegratol from Dr. Depry, which he stopped after he consulted with Dr. Depry about its ineffectiveness, he did not receive treatment for his neurological issues. (*Id.*) Fowler alleged that after a medical visit on February 5, 2020, he had not seen a doctor regarding his neurological symptoms. (*Id.* at 30-31.)

## 2.    Religious Claims

The first relevant religious claim is related to the failure to provide Fowler with a proper religious diet. (ECF No. 62 at 56-61.) Fowler claimed his religion required a fruit and vegetable-based diet that includes only "non-sentient sources for substance." (*Id.* at 57.) Fowler claimed the standard diet at HDSP did not provide enough nutrients when he adhered to his religious beliefs. (*Id.* at 58.) Fowler requested to be placed on the vegan diet but was denied. (*Id.* at 52.) Fowler then requested to be placed on the Common Fare diet, which adheres well with his religious needs. This request was granted on July 8, 2019. (*Id.* at 59.) Fowler claimed that, once on Common Fare diet, the meals he received at HDSP were not consistent with the official NDOC Common Fare menu. (*Id.* at 59-60.) Fowler submitted a Request for Accommodation of Religious Practices along with multiple kites and grievances about this issue. (*Id.*, ECF No. 62-3 at 57.) His second level

grievance on the issue was denied on March 16, 2019. (ECF No. 62-3 at 53.)

Fowler's second relevant religious claim alleged a violation of his right to free exercise of religion. Specifically, Fowler alleged the chapel at HDSP was closed for over six months due to COVID-19. (*Id.* at 64.) He alleged that although his religion, Thelema, had less than twenty-five members and required outdoor services that would satisfy the COVID-19 restrictions, he could not attend or organize services. (*Id.*) He alleges that during this time, other large gatherings were permitted. (*Id.*)

### B. Procedural History of Las Vegas Case[3]

During the pendency of the Las Vegas case, Fowler filed multiple motions for temporary restraining orders or preliminary injunctions relating to seizure medication. (*See* ECF Nos. 13, 16, 27, 28, 44, 101, 121, 199, 279, 280.) Specifically, on January 18, 2022, Fowler filed an "emergency motion for temporary restraining order and preliminary injunction regarding seizure treatment." (ECF No. 279.)[4] Particularly relevant here, Fowler described his history of seizure activity and subsequent treatment at both HDSP and the Lovelock Correctional Center ("LCC"). (*Id.*) Fowler included allegations against Marks, including claims that Marks abruptly discontinued his medication. (*Id.* at 8.) Fowler also alleged Marks retaliated against him because he "verbally maligned and threatened to sue [Marks]." (*Id.* at 18.)

On February 3, 2022, the parties participated in a court-sponsored settlement conference. (ECF No. 288.) The settlement conference was continued to February 17, 2022, and a settlement was reached.[5] (ECF No. 291.) A stipulation of dismissal with

---

[3]    Unless otherwise noted, citations in this section refer to the CM/ECF filings in *Fowler v. Sisolak*, *et.al*, (*Las Vegas*) No. 2:19-cv-01418-APG-DJA (D. Nev. filed Aug. 15, 2019).

[4]    Portions of Fowler's SAC in the Reno case include paragraphs that are copied from this motion.

[5]    The settlement agreement is located in two places on the Reno case docket and was provided by both parties. (ECF No. 10-2 at 22-31, ECF No. 38 at 138-146.) The Federal Rules of Evidence permit a court to notice an adjudicative fact if it is "not subject

1    prejudice was filed on April 18, 2022, which was granted the following day. (ECF Nos.

2    301, 302.)

3         The settlement agreement covered all "events of the disputes herein described, all

4    persons described, and those events or occurrences complained of in the Complaint(s)

5    in the Action, the Court's Screening Order, and all subsequent pleadings filed in the

6    Action." (ECF No. 10-2 at 24 (Reno case).) The agreement also stated "[Fowler] forgoes

7    any legal claims relating to the Action, as against all Named Defendants and *potential*

8    *defendants*, as they would relate to the allegations in the Complaint(s)." (*Id*. at 25

9    (emphasis added).) The agreement is a "comprehensive settlement agreement" that

10   "represents a mutual release of all claims related to or arising out of the Action or facts

11   pertinent to or underlying the Action." (*Id*. at 26.)

12        The terms of the settlement agreement are as follows: (1) Fowler received a

13   payment of $3,500; (2) the Office of the Attorney General agreed to seek approval from

14   the NDOC to add items to the canteen; (3) while at LCC, Fowler would be allowed to have

15   ten books in his cell; (4) while at LCC, Fowler could swap one legal box with a personal

16   box; (5) Fowler would be allowed to consult with an NDOC doctor, *other than Dr. Dana*

17   *Marks*, to determine if it is medically necessary for Fowler to receive ear plugs, antiseizure

18   medication, and/or a lower bunk; (6) Fowler could receive assorted items from the

19   property room; and, (7) a boom box from the property room if one becomes available. (*Id*.

20   at 25-26 (emphasis added).)

21        Finally, in the event of a breach of the agreement, the parties agreed to give the

22   other party notice describing the breach and thirty days to cure the breach before

23   _____

24   to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute"
     if it is "generally known," or "can be accurately and readily determined from sources

25   whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc*.,
     899 F.3d 988, 999 (9th Cir. 2018) (citing Fed. R. Evid. 201(b)(1)–(2)). Here, the

26   authenticity of the document is not in question because both parties provided the same
     settlement agreement and neither party objected to its authenticity at a hearing in the

27   Reno case where the agreement was the focus of the hearing. (*See* ECF No. 62, 98.)
     Therefore, the Court takes judicial notice of the settlement agreement executed in the Las

28   Vegas case. Fed. R. Evid. 201(b).

submitting any enforcement actions to the Court. (*Id.* at 28.) Following that thirty-day period, the parties agreed that any action for breach of contract would be filed in the Nevada State District Court applying Nevada law. (*Id.*)

### C. Procedural History of Reno Case

Fowler initiated the instant lawsuit on May 2, 2022 — only thirteen days after the stipulation to dismiss was granted in the Las Vegas case. (ECF No. 1; ECF No. 302 (Las Vegas case).) Thereafter, Fowler filed his first amended complaint on June 1, 2022, which the Court screened on July 15, 2022. (ECF Nos. 8, 16.) At screening, the District Court allowed the following claims to proceed: (1) an Eighth Amendment claim for deliberate indifference to serious medical needs against Marks, LeGrand, Minev, and Daniels; (2) a First Amendment retaliation claim against Marks; (3) a First Amendment free exercise claim based on religious diet against Terance and LeGrand; and (4) a First Amendment right to free exercise claim based on cancellation of religious services between July 2021 and April 2022 against Daniels. (ECF No. 16 at 15-16.)

In addition to his first amended complaint, Fowler also filed an emergency motion for temporary restraining order and an emergency motion for preliminary injunction. (ECF Nos. 11, 12.) Defendants opposed the motions arguing Fowler's claims were precluded by the prior settlement. (ECF No. 34.)

On October 4, 2022, the Court held a telephonic hearing regarding the motions for injunctive relief. (ECF No. 62, 98.)[6] At the hearing, the Court asked Fowler about the settlement in the Las Vegas case. (ECF No. 98 at 11.) Specifically, the Court asked Fowler whether the previous lawsuit contained claims related to treatment of his seizures that extended until the settlement agreement was reached, to which Fowler responded that it did. (*Id.* at 12-13.) The Court then explained that many, if not all, of the claims in the instant litigation were precluded by the settlement agreement. (*Id.* at 13.) The Court also explained that because the factual allegations were covered by the settlement

---

[6]     ECF No. 62 consists of the minutes of the motion hearing and ECF No. 98 is the hearing transcript.

agreement, any claims that NDOC didn't comply with the provisions of the agreement or that resulted from conduct related to attempts to comply with the terms of the agreement should be brought as a separate breach of contract action in state court. (*Id.* at 14.) Fowler withdrew his motions and the Court granted Fowler leave to amend his complaint to assert only claims that were not released by the settlement agreement. (*Id.* at 21-24.)

Fowler filed an objection to the limitations described during the hearing, (ECF No. 63), and Defendants responded to the objection. (ECF No. 64.) On November 7, 2022, the District Court overruled Fowler's objection, ruling that:

> [the Court] did not preclude him from asserting new claims that are not barred by the settlement agreement. (ECF No. 62.) However, Fowler may not try to relitigate the same deliberate indifference claims from his other case. In the settlement agreement, Fowler explicitly agreed to dismiss with prejudice and release "all claims related to or arising out of the Action or acts pertinent to or underlying the Action." (ECF No. 38 at 141.) *See Fowler v. Sisolak, et al.*, Case No. 2:19-cv-01418-APG-DJA, ECF Nos. 74, 301 (D. Nev. Apr. 18, 2022). The terms of that agreement are binding. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505-06 (2001) (dismissal with prejudice "operates as an adjudication upon the merits" and the party is barred from refiling the same claim in the same court) (citations omitted).

(ECF No. 65 at 3.) The District Court also found no error in restricting Fowler's leave to amend his complaint because "barred claims would inevitably be dismissed, amendment of those claims would be futile. *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 871 (9th Cir. 2016)." (*Id.*)

On November 22, 2022, Fowler filed a motion for leave to file his SAC. (ECF No. 66.) However, Defendants did not file any opposition or response to the motion — despite the Court's order expressly setting a briefing schedule. (ECF No. 62.) Based on Defendant's failure to oppose the motion to amend, the Court granted Fowler's motion as *unopposed*. (ECF No. 68.) Consequently, the SAC became the operative complaint, and the following claims were allowed to proceed: (1) an Eighth Amendment deliberate indifference to serious medical needs claim against NDOC, Minev, Marks, Daniels, and Jane Doe; (2) a First Amendment retaliation claim against Marks; (3) a First Amendment free exercise based on Fowler's inability to participate in the common fare diet against LeGrand and Terance; and, (4) a First Amendment free exercise based on cancellation

of religious services between July 2021 and April 2022 against Daniels. (ECF No. 69.)

On February 17, 2023, Defendants filed a motion to dismiss the SAC. (ECF No. 73.) Fowler opposed the motion to dismiss. (ECF No. 88). Defendants did not file a reply brief.

In addition, Fowler filed a motion for leave to file a TAC on April 3, 2023. (ECF No. 86.) In his motion to amend, Fowler argues that the TAC "resolves Defendants' objection regarding the supposedly improper joinder by removing the religious claims in counts 3 & 4. . ." (ECF No. 86 at 4.) He also claims the TAC "clarifies events alleged in the SAC, adds as defendants people whose activities were alleged in the SAC, and pleads related events." (*Id.* at 5-6.) Although the Court granted Defendants' an extension of time to file an opposition to the motion to amend, Defendants did not file an opposition. Rather, on the due date for the opposition to be filed, Defendants filed a "motion to stay" these proceedings pending the Court's ruling on the motion to dismiss. (ECF No. 99.)

### D.    Factual Background of Reno Case

The current operative complaint in this case is Fowler's SAC. (ECF No. 69.)  Fowler asserts four claims in the Reno case, which fall into the same two categories as the Las Vegas case — medical claims and religious claims. Each claim will be described in turn.

### 1.    Eighth Amendment Deliberate Indifference (Claim 1)

In Claim 1, Fowler sued the NDOC, Minev, Marks, Daniels, and Jane Doe for having deliberate indifference to serious medical needs. (ECF No. 69 at 4.) Fowler alleges that he has been experiencing seizures since 2019 due to a series of falls caused by withdrawals from his psychiatric medications. (*Id.*) Fowler discusses the Las Vegas case "as background information," including that the parties settled "the matters of causing and initially failing to treat the seizures." (*Id.*) Fowler explains that pursuant to an order in the Las Vegas case, Defendants sent Fowler to a neurologist who prescribed Vimpat and Gabapentin for his seizures. (*Id.*, ECF No. 155 (Las Vegas).) After less than a month receiving the seizure medication, Fowler alleges LCC physician Marks abruptly discontinued the medications. (ECF No. 69 at 5.) Three days following the discontinuation

of the medication, on August 1, 2021, Fowler describes having a seizure and being taken to the emergency room. (*Id.*) The emergency room physician closed a hole in Fowler's head with four staples and wrote another prescription for Gabapentin. (*Id.*)

Upon returning to LCC on August 2, 2021, Fowler "angrily ranted to numerous guards and nurses that he believed Dr. Marks to be a 'quack' and a psychopath" and threatened to sue Marks. (*Id.* at 6.) The next morning, Fowler alleged that Marks ordered LCC's nurses not to follow the prescription for Gabapentin and discontinued two others of Fowler's prescriptions. (*Id.*) On August 3, 2021, Fowler had another seizure which reopened his head wound, but Marks ordered that Fowler not be taken to the hospital. (*Id.*) Fowler claims he sent medical kits to Marks and Minev asking to have his medication restored. (*Id.*) Fowler then turns to an explanation of how he exhausted his administrative remedies. (*Id.* at 7.)

Throughout the above discussion, Fowler makes citations to documents from the Las Vegas case. In fact, most paragraphs from pages 5-7 of the SAC are virtually identical to paragraphs used in a motion for temporary restraining order in the Las Vegas case. (ECF No. 279 at 8-9 (Las Vegas).) These paragraphs seem to have been copied from the motion for temporary restraining order, with very minor changes such as changing the names of exhibits. Fowler did not attach exhibits to his SAC, but he did attach exhibits to his first amended complaint and some of the exhibits referenced are present in the various amended complaints filed in the Las Vegas case. (ECF No. 10, ECF No. 62 (Las Vegas).) For example, in explaining a December 6, 2021, visit with Dr. Kaiser, Fowler references ECF Nos. 276 and 278, which obviously refer to filings in the Las Vegas case as no such documents exist in the Reno case. (ECF No. 69 at 7.)[7]

---

[7] The SAC describes some events that took place after the initial filing of the original complaint on May 2, 2022. Specifically, Fowler explains that he was moved from LCC to NNCC on May 5, 2022 (three days after filing the complaint), to be seen by a doctor "other than Dr. Dana Marks" pursuant to the express terms of the settlement agreement. (See ECF No. 69 at 7; ECF No. 10-2 at 25.) Although Fowler details information about these follow up visits, which took place with Dr. Halki and Dr. Doyle and occurred between May 2022 and November 2022, Fowler explicitly did not name either doctor as a defendant in Claim 1 based on these events or actions. (*See* ECF No. 86 at 5) (Fowler acknowledges

### 2. First Amendment Retaliation (Claim 2)

In Claim 2, Fowler alleges a First Amendment retaliation claim against Marks for allegedly discontinuing his seizure medication. (ECF No. 69 at 15.) In the SAC, Fowler "incorporates by reference all text from Claim 1" and does not provide any supplemental information. (*Id.*)

As discussed above, Fowler has had multiple instances where he has a seizure that causes an injury which requires hospitalization. Most relevant to the retaliation claim is the hospital visit on August 1, 2021. (*Id.* at 5.) Fowler was transported to the hospital after having a seizure which caused him to fall and injure himself, resulting in four staples to close a wound in his head. (*Id.*) The emergency room physician prescribed Fowler seizure medication, including Gabapentin. (*Id.*) Prior to the visit, on or about July 28, 2021, Fowler contends that Marks discontinued his seizure medication. (*Id.*) After returning to LCC on August 2, 2021, Fowler "angrily ranted to numerous guards and nurses that he believed Dr. Marks to be a 'quack' and a psychopath" and threatened to sue Marks. (*Id.* at 6.) Fowler claims that, in retaliation for the comments he made to the guards and nurses, Marks ordered LCC's nurses not to follow the prescription for Gabapentin and discontinued two other prescriptions. (*Id.*) On August 3, 2021, Fowler had another seizure which reopened his head wound, but Marks ordered that Fowler not be taken to the hospital. (*Id.*)

### 3. Religious Diet (Claim 3)

---

in his motion to amend that he did not name Dr. Halki as a defendant the SAC.)

Rather, he referenced these facts to underscore the actions of Minev. Specifically, Fowler alleged that Minev has:

> been aware of, and consciously disregarded, Plaintiff's serious medical need for seizure treatment since 2019. Although his liability from then through 2/17/22 was settled, Minev has also been aware of, and consciously disregarded, the excessive risks to Plaintiff's health caused by Marks' discontinuation of Plaintiff's medications since at least 8/24/21.

(*Id.*) Fowler continues by comparing Minev's alleged culpability to that of Daniels, who Fowler says also had knowledge of the issues with Marks. (*Id.* at 14.)

In Claim 3, Fowler alleges LeGrand and Terance interfered with his religious diet accommodation. (ECF No. 69 at 16.) Fowler alleges that, since 2018, he has been an adherent of the Thelema religion. (*Id.*) He alleges that he has been unable to properly exercise his religious beliefs since mid-August 2021. (*Id.* at 21.) Fowler explains that the time given for meals is minimal and as a result, it is difficult for most inmates to finish their meals. (*Id.* at 17.) For inmates in LCC's structured living program ("SLP"), the time limit is further restricted and "most inmates neither sufficiently chew their food nor eat all the food on their tray" because they are given only eight to twelve minutes to eat. (*Id.*) Fowler was in the SLP from July 2021 to February 2022. (*Id.*) Terance oversaw the SLP until December 2021 and LeGrand directly oversees both SLP and the dining hall. (*Id.* at 18.)

Fowler began receiving the "common fare diet" in April of 2019. (*Id.* at 16.) This diet consists of only raw ingredients to make meals, not a prepared meal. (*Id.* at 18.) He explains that the raw ingredients make it even more difficult to eat a full meal within the allotted time at LCC. (*Id.*) He filed an informal grievance and sent multiple kites trying to remedy the situation. (*Id.*) Fowler tried to switch back to the regular diet temporarily due to these issues but was told that he would have to wait six months before again applying to be on the common fare diet. (ECF No. 69 at 19.) On August 25, 2021, Terance denied Fowler's informal grievance. (*Id.*, ECF No. 10-3 at 17.) Fowler filed a first level grievance which was again denied. (ECF No. 69 at 20, ECF No. 10-3 at 19-22.) Fowler filed a second level grievance on October 19, 2021. (ECF No. 69 at 20, ECF No. 10-3 at 24-26.)

No response to the second level grievance is attached, but the time limit for a response to a second level grievance is 60-calendar days. AR 740.10(3). If a response is not given within the time, the inmate must submit an "Offender Request Form" to the individual responsible for responding along with a copy of the overdue grievance or the grievance number. AR 740.10(4). If neither a response to the Offender Request Form nor a response to the underlying grievance within 60 days of the form, the inmate will have exhausted his administrative remedies. *Id.* There is no record here that Fowler sent the requisite Offender Request Form. However, assuming arguendo that he did file the

1   Offender Request Form and no response was given, the 120-day waiting period for

2   purposes of administrative exhaustion would have ended on February 16, 2022, three

3   months before the filing of the instant lawsuit.

4              **4.       Religious Services (Claim 4)**

5          In Claim 4, Fowler alleges Daniels violated Fowler's First Amendment right to free

6   exercise of religion. In his brief explanation, Fowler claims that from June 15, 2021, to

7   April 1, 2022, Daniels instituted a policy banning religious services in NDOC prisons,

8   allegedly for COVID-19 prevention. (ECF No. 69 at 22.) Fowler claims that during this

9   time, numerous other types of large gatherings were allowed. (*Id.*) Fowler claims Daniels

10  was aware of less restrictive alternatives to mitigate the spread of COVID-19. (*Id.*) Fowler

11  explains that his religion, Thelema, is an earth-based religion requiring outdoor worship.

12  (*Id.*)

13  **II.      MOTION TO DISMISS**

14         The Court first turns to the motion to dismiss the SAC filed by Defendants on

15  February 17, 2023. (ECF No. 73.) Fowler opposed the motion to dismiss. (ECF No. 88).

16  Defendants did not file a reply.[8]

17         Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss

18  _____

19  [8]      As noted above, Fowler also filed a motion for leave to file a TAC on April 3, 2023,
    which he claims addresses the arguments and issues raised by Defendants with respect
20  to the SAC. (ECF No. 86.) In some instances, the filing of a motion to amend may render
    a motion to dismiss based on the previous complaint moot. *Seneca Ins. Co. v. Strange*
21  *Land, Inc.,* No. 3:14-CV-00381-LRH-WG, 2014 WL 7336208, at *3 (D. Nev. Dec. 22,
    2014) (citing *Witt v. Hampton & Hampton,* No. 2:13–cv–2344, 2014 WL 4854302, at *1
22  (D. Nev. Sept. 29, 2014)). However, the court is only required to analyze a motion to
    amend first "when a plaintiff filed its an [sic] amended complaint as a matter of course."
23  *Anderson v. Bank of America, N.A.*, No. 2:15-CV-00198-EJL-REB, 2016 WL 7494304, at
    *1 (D. Idaho Jan. 13, 2016) (citing *Barnes v. District of Columbia*, 42 F.Supp.3d 111, 117
24  (D.D.C. 2014) (quotations omitted). A party may amend its pleading as a matter of course
    within 21 days of serving the complaint, or "if the pleading is one to which a responsive
25  pleading is required, 21 days after service of a responsive pleading or 21 days after
    service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P.
26  15(a)(1).

           In this instance, Defendants filed their motion to dismiss on February 17, 2023.
27  (ECF No. 73.) Fowler did not file his motion to amend his complaint until April 3, 2023,
    more than 21 days after the motion to dismiss was filed. (ECF No. 86.) Therefore, the
28  Court first resolves Defendant's motion to dismiss. *Barnes*, 42 F.Supp.3d at 118-119.

on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A complaint challenged "by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but requires plaintiff to provide actual grounds for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A motion to dismiss pursuant to Rule 12(b)(6) tests the "legal sufficiency of the claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "view[ed] . . . in the light most favorable to the" nonmoving party. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1087 (9th Cir. 2021).

The Ninth Circuit has found that two principles apply when deciding whether a complaint states a claim that can survive a 12(b)(6) motion. First, to be entitled to the presumption of truth, the allegations in the complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Second, so that it is fair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, "must *plausibly* suggest an entitlement to relief." *Id.* (emphasis added).

Dismissal is proper only where there is no cognizable legal theory or an "absence of sufficient facts alleged to support a cognizable legal theory." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 965 (9th Cir. 2018) (quoting *Navarro*, 250 F.3d at 732). Additionally, the court takes particular care when reviewing the pleadings of a *pro se* party, because a less stringent standard applies to litigants not represented by counsel. *Garmon v. Cnty. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016).

A court can grant a motion to dismiss for failure to state a claim with leave to amend. *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1113 (9th Cir. 2013). The court should "freely give" leave to amend when there is no "undue

delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of . . . the amendment, [or] futility of the amendment...." Fed. R. Civ. P. 15(a)(2). Usually, leave to amend is only denied when it is clear the deficiencies of the complaint cannot be cured by amendment. *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). Whatever the reason, the court must explain denying a party leave to amend. *Sharkey v. O'Neal*, 778 F.3d 767, 774 (9th Cir. 2015).

## A. CLAIM AND ISSUE PRECLUSION (RES JUDICATA)

Defendants' motion to dismiss is based primarily on the argument that each of Fowler's claims are foreclosed by the settlement agreement and res judicata. (ECF No. 73 at 2-8.) Therefore, the Court must first examine whether Fowler is barred from bringing any claims in the Reno Case due to claim or issue preclusion based on the settlement reached in the Las Vegas case.

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citing *Semtek Int'l, Inc.*, 531 U.S. at 507–08). "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,' these two doctrines protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Id.* (alterations in the original) (quoting *Montana v. U.S.*, 440 U.S. 147, 153–54 (1979)). This doctrine extends to actions brought under § 1983. *Allen v. McCurry*, 449 U.S. 90, 104 (1980).

Res judicata precludes lawsuits on "any claims that were raised or could have been raised in the prior action." *Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001.) The Court must determine whether (1) there was a final judgment on the merits, (2) the same claim or cause of action was involved in both suits, and (3) the parties are identical or in privity. (*Id.*) For the reasons discussed below, the Court recommends that Defendants' motion to dismiss be granted as to Claims 1, 2, and 4.

### 1. Final Judgment

Under the doctrine of claim preclusion, a final judgment on the merits in a case precludes a successive action. "However, the claim preclusion inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 687 (9th Cir. 2019) (internal citations and quotations omitted.) "A judgment entered based upon the parties' stipulation, unlike a judgment imposed at the end of an adversarial proceeding, receives its legitimate force from the fact that the parties consented to it." *Id*. This is so because a settlement can limit the scope of the preclusive effect of a dismissal with prejudice by its terms. *Id*.

"Two (or more) parties 'may negotiate a settlement of [a] dispute and ... execute a release of all claims. The release acts as a simple contract between the two private parties[.]'" *Id*. at 690 (quoting *Grimes v. Vitalink Commc'ns Corp*., 17 F.3d 1553, 1557 (3d Cir. 1994)). "But when a court dismisses an action because of a settlement, the settlement and release of claims ... is stamped with the imprimatur of [a] court with jurisdiction over the parties and the subject matter of the lawsuit." *Id*. "The settlement and release become a 'final judgment' and 'not simply a contract entered into by ... private parties....'" *Id*. at 690-91. "The agreement determines the scope of preclusion in [such an] action as a matter of preclusion law, not as a matter of contract." *Id*. at 691 (citing Wright, Federal Practice and Procedure § 4443).

Courts "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion." *Id*. at 689-90 (citing *F.T.C. v. Garvey*, 383 F.3d 891, 898 n. 7 (9th Cir. 2004). "'The best evidence of [the parties'] intent is ... the settlement agreement itself ..., as interpreted according to traditional principles of contract law.'" *Id*. at 690 (alteration original).

"Contract terms are to be given their ordinary meaning, and when the terms of a

contract are clear, the intent of the parties must be ascertained from the contract itself."

*Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999), as amended on denial of reh'g, 203 F.3d 1175 (9th Cir. 2000). "The construction and enforcement of settlement agreements are governed by principles of local law." *Jones v. McDaniel*, 717 F.3d 1062, 1067 (9th Cir. 2013) (internal citations and quotations omitted). "That is true, 'even where a federal cause of action is settled or released.'" *Id.*

"Under Nevada law, 'a settlement agreement['s] construction and enforcement are governed by principles of contract law.'" *Id.* (citing *May v. Anderson*, 121 Nev. 668, 119 P.3d 1254, 1257 (2005)). The Nevada Supreme Court has noted that "[t]ypically, '[c]ontractual release terms ... do not apply to future causes of action unless expressly contracted for by the parties.'" *Id.* (quoting *Clark v. Columbia/HCA Info. Servs.*, 25 P.3d 215, 223-24, 117 Nev. 468, 480 (2001). "A contract is ambiguous when it is subject to more than one reasonable interpretation. Any ambiguity, moreover, should be construed against the drafter." *Anvui, LLC v. G.L. Dragon*, LLC, 163 P.3d 405, 407, 123 Nev. 212 (2007).

Therefore, to determine if this element of claim preclusion is met, the Court must review the settlement agreement in the Las Vegas case to determine if the parties' agreement precludes the claims in this case. Here, there is unambiguous language making it clear that the parties intended a comprehensive settlement agreement. Specifically, the settlement agreement:

> completely discharges the NDOC and its past, present, and future officers, directors, attorneys, employees, divisions, predecessors and successors in interest, administrators, and assigns, and all other persons, with whom any of the former have been, are now, or may become affiliated, of and from any and all liability, known or unknown, relating to the disputes in the Action."

(ECF No. 10-2 at 26.)

The settlement agreement therefore covers all claims — and potential claims — relating to disputes in the Las Vegas case as of the time of the settlement agreement. The settlement agreement also includes a provision stating that any breach of contract

claims shall be filed in Nevada *State* District Court, not the Federal District of Nevada. (ECF No. 10-2 at 28.) Therefore, if the claims in the Reno case arise out of the factual allegations in the Las Vegas case, Fowler's sole remedy is to file a breach of contract claim in state court and this Court does not have jurisdiction over those claims.

### 2. Identity of Claims

The identity of claims element is satisfied if either the same claims or causes of action are alleged in the two matters or if it is determined that there is an identity of claims. An "identity of claims exists when two lawsuits arise from the same transactional nucleus of facts." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1078-79 (9th Cir. 2003) (internal citations and quotations omitted). Thus,

> res judicata bars relitigation of all grounds of recovery that were asserted, or could have been asserted, in a previous action between the parties, where the previous action was resolved on the merits. It is immaterial whether the claims asserted subsequent to the judgment were actually pursued in the action that led to the judgment; rather, the relevant inquiry is whether they could have been brought.

*Id*. To determine whether an identity of claims exists between the first and second case, the Court must review the facts and circumstances of each case to determine if they arose out of the same transactional nucleus of facts.

### a. Medical Claims

As to Claims 1 and 2, there is a significant overlap of the facts and circumstances alleged in each case. Fowler references the settlement and previous lawsuit in the complaint, but states that the settlement was only for "the matters of causing and initially failing to treat the seizures." (ECF No. 69 at 4.) However, the claims in the Reno SAC rely on factual allegations predating the settlement agreement. For example, as part of his factual allegations in the Reno SAC, Fowler describes seeing a neurologist pursuant to a court order in the Las Vegas case. (*Id*.) This neurologist is the person who prescribed Fowler the Vimpat and Gabapentin that he alleges Marks abruptly discontinued. (*Id*. at 4-5.) Therefore, the claims arising from discontinuation of Fowler's medication by Marks was predicated by actions taken pursuant to the Las Vegas case.

In addition, on January 18, 2022, Fowler filed an "emergency motion for temporary restraining order and preliminary injunction regarding seizure treatment." (*Las Vegas* ECF No. 279.) Critically, Fowler includes his allegations against Marks in that motion. Fowler includes the allegation that Marks retaliated against Fowler because he "verbally maligned and threatened to sue [Marks]" after Marks discontinued Fowler's seizure medication. (*Id.* at 18.) Many of the same exact paragraphs appear in the complaints in the Reno case and the overlapping allegations make up most of Fowler's retaliation claim against Marks. The relevant inquiry is whether Fowler could have brought the claims against Marks in the Las Vegas case. *Tahoe-Sierra Preservation Council, Inc.*, 322 F.3d at 1078-79 (citations omitted).

In the Las Vegas case, Fowler was given leave to file a fourth amended complaint. (ECF No. 132.) The Court's scheduling order allowed Fowler to file a motion to amend by June 8, 2021. (*Id. a*t 1.) Fowler filed multiple motions for extension of time to file a fourth amended complaint. (ECF Nos. 169, 189, 215, 242, 247, 273.) However, because the case was stayed, the deadline for him to file an amended complaint did not pass before the settlement agreement was made. As such, Fowler could have added the claims against Marks in the Las Vegas case. Fowler had already alleged claims relating to the failure to be treated for his seizures, and the issues with Marks derive from that failure. Therefore, the identity of claims element is met for Claims 1 and 2.

### b.    Religious Claims

Now the Court turns to the identity of the religious claims. First, the Court will review whether Claim 3, the religious diet claim in the Reno case, could have been brought in the Las Vegas case. *Tahoe-Sierra Preservation Council, Inc.*, 322 F.3d at 1078-79 (citations omitted). The claims in the Reno case all relate to activities which occurred at LCC while Fowler was living in LCC's Structured Living Program ("SLP"). (ECF No. 69 at 16-21.) In contrast, the claims in the Las Vegas case all relate to activities which occurred at HDSP. (ECF No. 62 at 56-61 (Las Vegas).) Critically, the claims in both cases are specific to the NDOC facility at which they occur. For example, in the Reno SAC, Fowler

cites LCC policies specifically, such as a policy restricting inmates from bringing their food out of the "chow hall" and another restricting inmates to 20 minutes to eat for those living in the SLP. (ECF No. 69 at 16-17.) In the Las Vegas case, Fowler explained he switched to the Common Fare diet because of the "toxin-laden, nutrient-lacking food provided by HDSP…" (ECF No. 62 at 58 (Las Vegas).) The complaint in the Reno case being specific to LCC policies where the Las Vegas allegations took place entirely at HDSP means that the identity of the claims are not the same. The Court finds that claims arising out specific policies at two separate locations cannot arise out of the transactional nucleus of facts. *Tahoe-Sierra Preservation Council, Inc.*, 322 F.3d at 1078-79 (citations omitted). Therefore, because the identity of the claims as to the religious diet claim are not the same in the Las Vegas and Reno cases, Claim 3 is not precluded by res judicata.

Now, the Court turns to Claim 4, which alleges violations of Fowler's access to religious services. As with Claim 3, Claim 4 includes multiple NDOC locations. However, the nature of the claim itself leads to a different conclusion. Where the facts of Claim 3 are specific to each NDOC facility, Claim 4 encompasses actions taken that affected the entire NDOC. Fowler alleges that "[f]rom 7/15/21 to approximately 4/1/22, Daniels instituted a policy banning all religious services in NDOC prisons" due to COVID-19. (ECF No. 69 at 22.) Due to the breadth of the Reno claim encompassing *all* NDOC facilities, it necessarily covers the claim made in the Las Vegas case that the chapel at HDSP was closed due to COVID-19. (ECF No. 62 at 64 (Las Vegas).) Therefore, the facts alleged in Claim 4 do arise out of the same transactional nucleus of facts because the reason for restricting religious services was the same: concerns arising from the COVID-19 pandemic. *Tahoe-Sierra Preservation Council, Inc.*, 322 F.3d at 1078-79 (citations omitted). Therefore, Claim 4 for access to religious services has the same identity in both the Reno and Las Vegas cases.

///

///

### 3.    Parties

Finally, for res judicata to apply, the parties must be identical or there must be some sort of privity between them. *Owens*, 244 F.3d at 713. In the Reno SAC, Fowler lists the following defendants for his medical claims: NDOC[9], Minev, Marks, Daniels, and Jane Doe. (ECF No. 69 at 4.) As to Claim 4 — the access to religious services claim — Fowler sues Daniels in the Reno case. In the Las Vegas case, the Defendants for the related claims were Minev, Daniels, and Jane Does 1-3.[10] (ECF No. 62 at 18, 29 (Las Vegas case).) As to Minev and Daniels, there was a final judgment on the merits in the Las Vegas case, the same claim or cause of action involved in both suits, and the parties are identical or in privity. *Owens*, 244 F.3d at 713. Therefore, the Court recommends the motion to dismiss as to Minev and Daniels be granted as to Claims 1 and 4.

However, Marks and Jane Doe, who are the remaining named defendants in Claims 1 and 2, are not readily identifiable as identical parties. Therefore, the Court must examine whether there is privity for res judicata to apply. *Id.*

#### a.    Marks

First, the Court will discuss Marks. The language of the settlement agreement specifically stated "[Fowler] forgoes any legal claims relating to the Action, as against all Named Defendants and potential defendants, as they would relate to the allegations in the Complaint(s)." (ECF No. 10-2 at 25.) As discussed above, Fowler filed a motion for "emergency motion for temporary restraining order and preliminary injunction regarding seizure treatment" in the Las Vegas case. (ECF No. 279 (Las Vegas case).) Fowler included his allegations that Marks abruptly discontinued his medication and that Marks

---

[9]    In Claim 1, Fowler adds the NDOC as a Defendant. Under § 1983, a required element is that the alleged constitutional violation must have been produced by the conduct of a 'person'. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The NDOC is an "arm of the state" of Nevada, and therefore is not a person under § 1983. *Hixon v. Nevada Dep't of Corr.*, No. 207CV01150PMPRJJ, 2009 WL 10678775, at *2 (D. Nev. July 8, 2009). Accordingly, Fowler may not sue the NDOC under § 1983 and the Court recommends that Defendant NDOC be dismissed.

[10]    For clarity, the Court only lists the Defendants also sued in the Reno case.

retaliated against Fowler because he "verbally maligned and threatened to sue [Marks]." (*Id.* at 8, 18.) Because Fowler filed the motion for injunctive relief before the settlement agreement was entered into, and Fowler had leave to amend his complaint at that time, Marks was a potential defendant in the Las Vegas case. Fowler could have amended his complaint to include Marks because Fowler's allegations against Marks arose out of the alleged failure to treat his seizures that serves as the basis for the claims against the other Defendants.

In addition, the language in the settlement agreement includes a provision that Fowler would have a medical "consult with an NDOC doctor, *other than Dr. Dana Marks*, to determine if it would be medically necessary for [Fowler] to be prescribed. . . antiseizure medication. . ." (ECF No. 10-2 at 28, emphasis added.) This language implies not only that Fowler had an issue with how Marks was managing his seizures, but that Marks was specifically contemplated during settlement negotiations. Therefore, because "the intent of the settling parties [determines] the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than [] general principles of claim preclusion," the Court finds that the claims against Marks are covered by the settlement agreement and claim preclusion will apply to him. *Wojciechowski*, 923 F.3d at 689-90 (citations omitted). Therefore, the Court recommends Defendants' motion to dismiss as to Marks be granted as to Claims 1 and 2.

### b.    Jane Doe

Due to the nature of naming unknown defendants as "Jane Doe," it is unclear from simple reading whether Jane Doe in the Reno case is one of the Jane Does 1-3 in the Las Vegas case. Therefore, analysis of the context in which each Las Vegas Jane Doe is mentioned is required. Jane Doe 1 was a "psychologist or psychiatrist" who interviewed Fowler on February 15, 2017, when he arrived at HDSP. (ECF No. 62 at 22 (Las Vegas).) Jane Doe 2 was a "P.M. pill call nurse" who told Fowler that his medication had been switched to the A.M. pill call on January 25, 2019. (*Id.*) Jane Doe 3 is another pill call nurse who did not provide Fowler with his medication. (*Id.* at 24.)

Now the Court will examine the allegations against Jane Doe in the Reno case. Fowler alleges that Jane Doe shares responsibilities with Minev, who is an identical party to the previous lawsuit. (ECF No. 69 at 14.) Fowler alleges that Minev and Jane Doe are "aware that their failure to hire adequate numbers of doctors and nurses causes [Fowler] and other inmates to suffer while waiting months to see a provider, but they still maintain their de facto policy of requiring medical understaffing." (*Id.*) Fowler does not include any other mentions of Jane Doe.

First, the Court does not find that there are facts to show that Jane Doe in the Reno case is the same as Jane Doe 1-3 in the Las Vegas case. However, in the Las Vegas case, Fowler alleged that Minev and the Medical Administrator shared responsibility for hiring and retaining medical staff and failed to ensure adequate staffing by hiring only a single psychiatrist for the entire NDOC inmate population. (ECF No. 62 at 21 (Las Vegas).) Fowler identified the Medical Administrator as Defendant Hager. (*Id.*) There are no facts to show whether or not Jane Doe in the Reno case is the same as Hager, or whether Jane Doe replaced Hager in that role. Regardless, the claims Fowler brings against Jane Doe in the Reno case are the same as the claims brought against Minev and Hager in the Las Vegas case. The terms of the settlement agreement cover all claims, known or unknown, as of the date of the agreement. (ECF No. 10-2 at 24.) The settlement agreement also covers "the NDOC and its past, present, and future officers, directors, attorneys, employees . . . and all other persons, with whom any of the former have been, are now, or may become affiliated, of and from any and all liability, known or unknown, relating to the disputes of the Action." (*Id.* at 26.)

Therefore, regardless of whether Hager and Jane Doe are the same party or whether Jane Doe is Hager's replacement, Fowler's claim against Jane Doe was intended to be barred by res judicata under the settlement agreement because Jane Doe's liability in the Reno case is the same as the liability of Minev and Hager in the Las Vegas case. *Wojciechowski*, 923 F.3d at 689-90 (citations omitted). The Court recommends Defendants' motion to dismiss as to Jane Doe be granted as to Claim 1.

22

### III.    MOTION TO AMEND

Having granted Defendants' motion to dismiss Claims 1, 2, and 4 as to all named Defendants in each of these claims, the Court must now consider Fowler's motion to amend. In the motion, Fowler seeks to amend his complaint to allegedly "clarify" his claims and add new defendants. (ECF No. 86.) Fowler claims the proposed TAC addresses the arguments and issues raised by Defendants with respect to the SAC. (*Id*.) Defendants did not file a timely opposition.

Federal Rule of Civil Procedure 15(a)(2) instructs that "[t]he court should freely give[] leave [to amend a pleading] when justice so requires." The Ninth Circuit has made clear Rule 15(a) permits liberal application. *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013). Under Rule 15(a), courts consider several factors, including: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) the futility of the amendment; and (5) whether the plaintiff has previously amended his complaint. *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). The factors do not weigh equally; rather, prejudice receives the greatest weight. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

As detailed above, the Court recommends Claims 1, 2, and 4 be dismissed as to all named Defendants based upon res judicata. Therefore, Fowler's proposed TAC, which attempts to add facts or information related to the events that occurred prior to the settlement agreement cannot cure the legal defects in these claims. Moreover, to the extent Fowler's proposed TAC also seeks leave to add several defendants to Claim 1 based on facts and events that occurred *after* the initial complaint was filed in May 2022, these allegations also do not cure the legal defects in these claims. Therefore, Fowler's motion to amend must be denied as amendment would be futile.[11]

---

[11]    To the extent that Fowler is seeking to "supplement" his complaint to add new medical claims  related to events that occurred after May 2022 against entirely new and distinct defendants, the Court declines to grant Fowler leave to do so. *See* Fed. R. Civ. P. 15(d) ("[o]n motion and reasonable notice, the court may, on just terms, permit a party

## IV.    CONCLUSION

For good cause appearing and for the reasons stated above, the Court recommends that Defendants' motion to dismiss, (ECF No. 73), be granted as to Claims 1, 2, and 4, and denied as to Claim 3. In addition, the Court also recommends that Fowler's motion to amend, (ECF No. 86), be denied.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

///

///

///

///

///

///

---

to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.") The only surviving claim in this lawsuit is Claim 3, which relates entirely to Fowler's religious diet and is proceeding against Defendants Legrand and Terance. Therefore, Fowler's proposed new medical claims arise out of an entirely separate and distinct set of facts and circumstances and do not involve any of the alleged defendants as those facts related to the single claim proceeding in this lawsuit. Therefore, these additional defendants and claims cannot be joined with Claim 3 and supplementation must be denied. See Fed. R. Civ. P. 18-20; see also General Order 2021-5. To the extent Fowler seeks to allege new medical claims against new defendants that occurred after the settlement agreement, he must do so in a new and separate lawsuit.

## V.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendants' motion to dismiss, (ECF No. 73), be **GRANTED** as to Claims 1, 2, and 4, and **DENIED** as to Claim 3.

**IT IS FURTHER RECOMMENDED** that Defendants NDOC, Minev, Marks, Daniels, and Jane Doe be **DISMISSED** from this action.

**IT IS FURTHER RECOMMENDED** that Fowler's motion to amend, (ECF No. 86), be DENIED.

**DATED**:  May 24, 2023  .

UNITED STATES MAGISTRATE JUDGE